Filed 12/16/15  P. v. Bolton CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041106 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS121238A) |
| v. | |
| CHIP KYLE BOLTON | |
| Defendant and Appellant. | |

A jury found appellant Chip Bolton guilty of two counts of making a false/fraudulent insurance claim (Ins. Code, § 1871.4, subd. (a)(1), counts 1 & 2), one count of attempted perjury (Pen. Code, §§ 118, subd. (a), 664, [1] count 3), one count of fraud to obtain aid (Welf. & Inst. Code, § 10980, subd. (c)(2), count 4), one count of perjury (§ 118, subd. (a), count 5), one count of grand theft (§§ 484, 487, subd. (a), count 6), and one count of insurance fraud (§ 550, subd. (b)(2), count 7).  On May 2, 2014, the court sentenced appellant to an aggregate term of eight years, eight months in county jail.

In this timely appeal from the judgment, appellant contends that the trial court violated his Sixth and Fourteenth Amendment rights and abused its discretion by dismissing a juror during jury deliberations.  Further, the court erred in failing to stay the sentences on counts 2, 5, and 7 pursuant to section 654.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Given the limited issues on appeal, we do not set forth the underlying facts in detail. However, we do set forth the factual and procedural background related to appellant's claim that the trial court erred in dismissing a juror during deliberations.

On April 3, 2014, the jury retired to deliberate at 12:30 p.m. At 4:45 p.m. the jury recessed for the evening. Out of the presence of the rest of the jury the following colloquy between the court and Juror No. 5 took place.

"THE COURT: We're on the record with one juror, Juror Number 5, still with us. You okay?

"JUROR NUMBER 5: I can't do this.

"THE COURT: You can't do it? So, here's what I propose. I propose that we go to sidebar actually. So if you would, would you join us over here. I'd like to talk to you privately."

The following discussion between the court and Juror No. 5 was held at sidebar.

"THE COURT: We're at sidebar, out of the presence of the rest of the world, with Juror Number 5, who is very emotional right now and had indicated that she can't really continue to participate in this. Is that how you're feeling?

"JUROR NUMBER 5: Yes.

"THE COURT: Can you give me some idea of what the angst is about? Is it making a decision? Is it the people involved in it? Is it the jury deliberation? Is there anything at all you can give me? [¶] I don't want to know what you're thinking or anything necessarily, just generally what the topic is.

"JUROR NUMBER 5: In the deliberation room—

"THE COURT: Interacting with other jurors—

"JUROR NUMBER 5: Uh-huh.

"THE COURT:—very difficult for you?

"JUROR NUMBER 5: Uh-huh.

2

"THE COURT: You feel that you can no longer continue to participate in that process?

"JUROR NUMBER 5: I don't think so. I—I think they're making—or they're wanting me to say something that I don't believe, and I can't do it.

"THE COURT: Do you feel that you can participate in the deliberation process with the other jurors?

"JUROR NUMBER 5: I don't feel like I can right now.

"THE COURT: It's a—I don't think—you know, I've been doing this for, I'll tell you, thirty-six years, and I've only seen one juror come out crying. That would be you. Shaking in your chair, unable to leave when the other jurors left. That's a pretty rare occasion. It's obviously having a serious impact on you. [¶] We expect a lot of jurors, of citizens coming in and being jurors, which includes taking you away from your normal life and everything. We do not expect you to sacrifice your life though.

"JUROR NUMBER 5: It's not that.

"THE COURT: Oh, well—

"JUROR NUMBER 5: It's not.

"THE COURT: You're still crying, you're still emotional, you're still shook up.

"JUROR NUMBER 5: I just don't know—I—I know what I believe, and I don't know if I can do it. I—don't know if I'm strong enough to stick with my guns. Well, I don't know if I can say that, but—I don't know. I—it got a little bit heated in there.

"THE COURT: It does that.

"JUROR NUMBER 5: And pretty much, it's everybody against me. And I feel like I've already made some—voted, or whatever, on a couple of things that I didn't believe, but I just did it just to be agreeing with them.

"THE COURT: All right. I'm going to have you take your chair. If you would, take a seat."

Defense counsel expressed his concern that Juror No. 5 was "taking a position and feeling intimidation from the other jurors, I don't know the law about jury intimidation kinds of issue[s], but if there was an intimidation that would be a concern. [¶] And I guess I would have to figure out what the—I can't do anything about it, but I'd want her to be confident and feel safe and not feel any kind of threat because she's taken a position that's contrary to what the other jurors had committed to or wanted her to take."

The court responded, "So here's where we are: We are dealing with a juror who has demonstrated emotions I've never seen in, I'm sure, a hundred plus trials, probably twice that frankly, but—" the prosecutor interrupted the court. The court went on: "And she's a big lady, and she was shaking like a leaf and had her head down between her knees practically, sitting on the chair, when all the other jurors were there. She is undergoing [an] extreme emotional reaction to this experience. And she's already indicated that she's capitulated, I think that's what she said anyway, to advocate—you know, she calls it pressure, but I know jurors advocate, even though they aren't supposed to necessarily, but they do advocate one position or another. And she's—she's capitulated to that. She's indicated—she's told us that she's done that despite feeling that—differently about the topic. So, she's not performing her job. [¶] And my responsibility would be to turn to her and say, Hey, stick to your guns, I suppose. You have to—you can't just capitulate. You have to change your mind only if you're convinced. And then, what am I doing? I'm telling her she has to go in there and be tougher than she's already been, and that's going to send her right down the tubes; there's no doubt in my mind. [¶] So there's no question in my mind that she can no longer continue to participate in this jury without us risking, I suppose, liability."

Defense counsel requested that the court wait and see if the juror could "manage to gather her energy" but if she did not feel she could do so by the morning, "I guess you'd have to excuse her?" The court refused to give the juror more time. Accordingly, immediately thereafter the court dismissed Juror No. 5; the court explained that it "could

4

not order" her "to go back into that jury room." The court picked one of the alternate jurors to fill Juror No. 5's spot.

The court asked defense counsel to comment for the record. Defense counsel expressed his concern about juror intimidation. Specifically, defense counsel told the court, "this is just sort of an extension of what I attempted to get at earlier; and that is, my concern is that if she was prepared to take a position and then felt intimidation by any of the jurors, that was beyond that she might be sensitive to the tug and push and pull of the dialog that may go on, so I just wanted to state that I'm concerned that, maybe appropriately, that your Honor didn't—you didn't explore that issue, but I felt there was one time where she hesitated and wanted to say that something had gone on, something in particular that felt both offensive to her and violated both her—that she felt intimidated and that she was disrespected. [¶] And my concern was that she was a—she was a holdout against the rest of the jurors and felt such intimidation that she was capitulating just so that she didn't have to feel the pressure from one or more of the other jurors. [¶] And we may—we'll never know that, but I just wanted to say that that's my concern. And certainly you'd expect that if she was the one person who was holding out for a not guilty, if she was not persuaded, and it sounded like that was where she was and the other jurors were pushing her to make a decision, rather than honoring her for struggling with the issues and coming to a conclusion on her own right."

The court was not convinced that there was "any indication whatsoever as to which way the jury was going, from any comment that she made. It could be for guilty or for not guilty, and she could be the lone for guilty or the lone for not guilty. [¶] The one thing that became clear is that she wasn't performing her job as a juror, that she was capitulating, she was giving in to whatever the pressure was. And I think we all know from our experience a jury—jury room can be very—it's not always a picnic." Defense counsel agreed with the court's observation. Again the court noted that the court did not "know which way she was headed."

5

Again defense counsel expressed his concern that there was juror intimidation; he said that because the juror was "stressed out" and that he respected the court's decision. However, he continued, "maybe she was the one that was holding out for guilty and the rest were not guilty. It was not perfectly clear. But I was just curious and I just wanted to make sure that if she could have held out but was feeling intimidation, then that would have been of great concern because they could do that to the next juror. It's a matter of integrity. It just would be wrong that that would be going on. [¶] So, I'm not stating an objection necessarily to your—to the decision you made, I appreciate that, but I just was concerned that, you know, if there was intimidation that may bode poorly for the next juror there would be."

The court felt that the juror had "an emotional breakdown" and therefore the court could not under those circumstances tell her not to "capitulate" and send her back to the jury room.

The next morning, the court substituted in an alternate juror. The jury returned to the jury room to continue deliberations at 8:25 a.m. At 11:22 a.m. the jury returned to the courtroom having reached a verdict. The jury found appellant guilty as charged.

<em>Discussion</em>

*Dismissal of Juror No. 5*

Appellant contends that the court dismissed Juror No. 5 without good cause. Further, he asserts that absent adequate investigation into potential juror misconduct, the dismissal of Juror No. 5 was not based upon a demonstrable reality that the juror was unable to perform the required functions as a juror. Appellant argues that the dismissal constituted an abuse of discretion and that he was prejudiced by the improper dismissal of a deliberating juror, which requires reversal in this case. We disagree.

The People assert that appellant has forfeited this claim by failing to object when the court dismissed Juror No. 5. The People point out that after the court announced its

6

ruling, defense counsel stated, "I think you have an obligation to do that and you did what you really had to do, given how [Juror No. 5] was stressed out about this."

Assuming for the sake of argument that the People are correct, we will address the merits of appellant's claim because he argues that defense counsel provided ineffective assistance of counsel by failing to adequately object. (*People v. Williams* (1998) 61 Cal.App.4th 649, 657 [addressing merits of a claim despite forfeiture because defendant asserted ineffective assistance of counsel].)

" 'If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged . . . .' (§ 1089.) Removal of a juror under section 1089 is committed to the discretion of the trial court, and we review such decisions by asking whether the grounds for such removal appear in the record as a demonstrable reality. [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 137 (*Thompson*).) "Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged. [Citation.]" (*People v. Espinoza* (1992) 3 Cal.4th 806, 821.)

The California Supreme Court has explained that a trial court's decision to remove a juror pursuant to section 1089 is reviewed on appeal for abuse of discretion. (See e.g., *People v. Leonard* (2007) 40 Cal.4th 1370, 1409.) In *People v. Barnwell* (2007) 41 Cal.4th 1038, the Supreme Court held that "that the more stringent demonstrable reality standard is to be applied in review of juror removal cases. That heightened standard more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury." (*Id.* at p. 1052.) Thus, the Supreme Court has "clarified that a somewhat stronger showing than what is ordinarily implied by [the abuse of discretion] standard of review is required. Thus, a juror's

inability to perform as a juror must be shown as a 'demonstrable reality' [citation], which requires a 'stronger evidentiary showing than mere substantial evidence.' [Citation.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 821.)

In *People v. Warren* (1986) 176 Cal.App.3d 324 (*Warren*), after the case had been submitted to the jury, a juror told the trial court "that she had been 'intimidated' by the other jurors, that she was in disagreement with them, that she felt she was going to 'break under it,' that 'I feel so intimidated now that I think I would vote the way the group wants to vote even though I firmly believe I shouldn't,' and that 'at this stage I'm afraid that I will give in and maybe I won't.' " (*Id.* at p. 326.) She said she could not follow the court's instruction that she should not be influenced to decide any question in a particular way because a majority of the jurors or any of them favor such a decision. (*Ibid.*) The appellate court found no abuse of discretion in the excusal of this juror. (*Id.* at p. 327.)

Appellant argues that removal of the sole holdout juror for acquittal is an issue at the heart of the trial process and must be meticulously scrutinized and it was critical that the court make a full inquiry into the facts before it determined that they constituted good cause for discharge of a juror that appeared to favor the defense. In essence, appellant is arguing that the court did not adequately investigate misconduct by the other jurors before it discharged Juror No. 5.

The California Supreme Court has cautioned that " 'a trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations.' [Citation.]" (*Thompson*, *supra*, 49 Cal.4th at p. 137.) Here, the source of the tension reported by Juror No. 5 was the deliberative process, and the trial court therefore acted within its discretion in not examining the other jurors, because to do so would have threatened to intrude on that process. (*Ibid.* [defendant contended that the trial court should have questioned the jurors to determine whether they were causing

8

stress to two jurors by impermissibly pressuring them to give up their lingering doubt about defendant's guilt; held, the source of the tension reported by the two jurors was the deliberations themselves, and the trial court therefore acted within its discretion in not examining the other jurors, because to do so would have threatened to intrude on the deliberation process].)

The trial court's questioning of Juror No. 5 revealed no suggestion of misconduct by the other jurors. Rather, it appears that Juror No. 5 was a holdout juror and did not agree with the position of the remaining jury members. Since there was no indication of misconduct by the other jurors—only a disagreement over what the evidence showed— the trial court acted within its discretion in limiting its inquiry to questioning Juror No. 5, which, as detailed above, the court performed quite thoroughly.[2]

Citing *United States. v. Brown* (D.C. Cir. 1987) 823 F.2d 591(*Brown*) and *United States. v. Symington* (9th Cir. 1999) 195 F.3d 1080 (*Symington*), appellant argues that the dismissal of Juror No. 5 violated his rights under the Sixth and Fourteenth Amendments. The rule promulgated in these federal cases precludes the dismissal of a juror for being unwilling to deliberate whenever there is a reasonable possibility that the impetus for the dismissal stems from the juror's views on the merits of the case. (*Brown*, *supra*, at p. 596, *Symington*, *supra*, at p. 1087.) Nevertheless, the California Supreme Court has "expressly rejected this rule." (*Thompson*, *supra*, 49 Cal.4th at p. 138.) We are bound by that ruling. (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

The issue in this case is not that Juror No. 5 was unwilling to deliberate, but rather she was unable to deliberate because of her extremely distressed state. The California

---

[2] At one point appellant argues that the court failed to follow up with Juror No. 5 when she said she felt intimidated. Nowhere in the colloquy between the court and Juror No. 5 did the juror use the word "intimidated." The juror said "it got a little bit heated" in the jury room, but her anxiety was a result of the situation in the jury room where the rest of the jurors did not agree with her position and she did not want to vote for something she did not believe in.

9

Supreme Court has recognized that trial-related stress can provide good cause for discharging a juror. (See *People v. Collins* (1976) 17 Cal.3d 687, 690-691, 696, [inability to cope with the experience of being a juror].) Accordingly, we conclude that in the absence of any evidence of intimidation or coercion by the other jurors, the trial court had good cause to dismiss Juror No. 5.

In sum, the evidence in the record supports our conclusion that Juror No. 5's inability to perform as a juror was shown as a demonstrable reality. Juror No. 5 was crying in the courtroom, and as defense counsel conceded, she was "shuddering" as if she had "heart palpitations." The trial court did not err in dismissing Juror No. 5.

*Section 654*

Section 654 provides, in pertinent part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (§ 654, subd. (a).)

Before sentencing, the prosecution filed a sentencing motion in which the prosecutor noted that count 3—attempted perjury—was subject to section 654's proscription against multiple punishments. During the sentencing hearing, the court noted that counts 1 and 2—making false/fraudulent insurance claims—were not subject to section 654, but count 3 "probably is." The court thought that count 4—fraud to obtain aid (welfare fraud) and count 5—perjury were "two separate things simply because the [w]elfare fraud is an ongoing, continuous effort and the perjury count conviction was isolated, a single event and very specific act." The court was not "sure" whether count 6—grand theft—and count 7—insurance fraud—were subject to section 654, but it thought that as one was a lesser included offense of the other, count 6 was subject to section 654. Accordingly, in sentencing appellant the court imposed the upper term of

10

five years on count 1, one third the midterm—one year on count 2—to be served consecutively, one third the midterm—eight months on count 4—to be served consecutively, one third the midterm—one year on count 5—to be served consecutively, and one third the midterm—one year on count 7—to be served consecutively. The court stayed the sentence on counts 3 and 6 pursuant to section 654.

Appellant argues that the court was required to stay the sentences on counts 2 and 7 under section 654, as the three offenses were based upon acts that constituted a continuing course of conduct and single objective—to obtain workers' compensation—for which, he asserts, he received punishment when he was sentenced on count 1. Further, appellant argues that the sentence on count 5 should have been stayed because his different misrepresentations regarding his household income were all part of his single objective to obtain welfare aid. The People disagree.

" 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.]" (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) If the court makes no express findings on the issue, as happened here with respect to count 7 in relation to counts 1 and 2, a finding that the crimes were divisible is implicit in the judgment and must be upheld if supported by substantial evidence. (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.) Thus, "[w]e review the trial court's findings 'in a light most favorable to the respondent and presume in support of the order the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]' [Citation.]" (*People v. Green* (1996) 50 Cal.App.4th 1076, 1085.)

Briefly, the evidence adduced at trial showed the following.

On February 27 or 28, 2011,[3] appellant slipped and injured his back when he fell onto a concrete floor while making a delivery on behalf of the Complete Logistics Company (CLC). CLC opened a workers' compensation claim and appellant received medical treatment for his injuries through the workers' compensation insurance provided by Gallagher Bassett Services (GBS). The treating physician assessed appellant with total temporary disability and appellant received temporary disability checks to cover his loss of income from March 11, 2011, to August 11, 2011. However, appellant continued to receive workers' compensation checks until November 2011.

Appellant returned to full work duty on August 18, 2011. CLC offered him a few truck driving positions, which appellant did not accept. Eventually, CLC terminated appellant's employment on November 23, 2011.

On December 17, 2011, appellant applied for Unemployment Insurance Benefits (UIB); he indicated that he had been "laid off." CLC challenged appellant's eligibility for benefits based upon appellant's rejection of the offered positions. Appellant received UIB from January 3, 2012, through March 3, 2012. Eventually, however he was found ineligible for the benefits because he had rejected the positions CLC had offered him.

*Counts 1 and 6—Fraudulent Insurance Claim and Grand Theft*

After appellant was placed on total temporary disability he made several false statements for the purpose of continuing to collect benefits. On April 6, 2011, appellant reported to a claims adjuster that he could not sit for more than 15 to 20 minutes or stand for more than an hour, that he had a numbing sensation from his buttocks to his knee, that he had a pain going up to his shoulder blade and the shoulder felt tight, that he needed to sit on a cushion to watch his daughter's baseball games, and that he was unable to hold his baby daughter. Appellant claimed that he was not getting any better; when asked

---

**[3]** The testimony was ambiguous as to whether the injury was sustained on February 27 or 28.

12

what he was doing to make his condition better or worse, he replied "nothing." Additional tests were ordered.

The same day, a private investigator conducted surveillance on appellant; appellant went to the YMCA gymnasium where he used an elliptical machine and played basketball. The following day, the same investigator saw appellant throw a football to a child. On April 11, appellant had a scheduled medical appointment. Appellant appeared to walk normally before he got to the doctor's office, but walked slowly into the medical facility. On April 19, the investigator saw appellant push a child on a swing, swing a baseball bat, and bend at the waist.

In addition, on April 19 the investigator watched as appellant attended another scheduled medical appointment. Appellant appeared to walk normally before going to his appointment, but walked with a limp as he was going into the doctor's office. Following the appointment, the investigator saw appellant walking normally at a much faster pace as he entered a coffee shop.

*Counts 2 and 3—Filing a False Insurance Claim and Attempted Perjury*

On June 10, 2011, appellant was called to testify under oath at a deposition conducted by CLC regarding his worker's compensation claim. At the deposition, appellant testified that since the accident he had experienced physical limitations from his injury. These limitations included an inability to jump, drive for more than 45 minutes at a time, climb stairs, ride a bicycle, throw a ball, engage in sports, or swing a bat, and until late May he had had trouble bending. Appellant said that he had not been to the YMCA or engaged in any exercise beyond his physical therapy exercises.

*Counts 4 and 5—Fraud to Obtain Aid and Perjury*

Appellant received welfare benefits from the Monterey County Department of Social Services (DSS). Initially, appellant filed for Cash Aid, Food Stamps, and Medi-Cal. He listed his household as consisting of himself and his son Seth Bolton. At the time, appellant listed Alexis Bushta and her son Tristan as roommate and roommate's

13

son.  In a face-to-face orientation with an eligibility worker on November 9, 2009, appellant claimed he was sharing rent with others but purchasing and preparing his meals separately.  In a telephone interview on November 20, 2009, appellant told an eligibility worker that he did not know who Tristan's father was and that all adults in the household were responsible for their own food.  Bushta told the same story in her own welfare claim; she said that she and her son Tristan were roommates of Chip and Seth Bolton; and she checked the box to indicate that her family bought and cooked food "apart from others living in the home."  In fact, appellant, Bushta, and the children had a family membership at the YMCA.  Eventually, appellant admitted that he was Tristan Bushta's father.  This meant that since appellant and Bushta were living under the same roof as a family they were required to file a joint application.

On August 5, 2011, appellant and Bushta filed an application for aid that did not disclose the workers' compensation income appellant was receiving; and in an interview on August 23, 2011, again they failed to report this income.

On January 25, 2012, during a recertification of the welfare claim, appellant signed some supporting documentation under penalty of perjury in which he failed to disclose his UIB income.  Appellant received his UIB income starting January 3, 2012.

Ultimately, the DSS determined that when filing together, appellant and Bushta were not eligible for benefits because the income they failed to report took them over the income threshold for aid.

*Count 7—Insurance Fraud*

Appellant made false or misleading statements to his treating physician.  Appellant's doctor testified that statements appellant made to him on April 4, April 11, and April 19 were "embellished, or exaggerated."  Further, appellant's doctor said that had he been aware of how fast appellant was recovering, he would have returned him to modified work sooner.  The time period charged—April 6 through June 10, 2011—

14

encompassed the time period during which the misrepresentations that counts 1 and 2 were based on were made.

As noted, appellant claims that counts 2, 5, and 7 should have been stayed under section 654. As to counts 2 and 7, he argues that counts 1, 2 and 7 were all part of his single objective of fraudulently obtaining workers' compensation benefits for the period April 6, 2011 through June 10, 2011. Therefore, he contends that the court erred in sentencing him on all three counts in violation of section 654.

Appellant was convicted of two counts of making a false or fraudulent insurance claim (Ins. Code, § 1871.4, subd. (a)(1)). Count 1 was based on his misrepresentations to the insurance adjuster on April 6, 2011; count 2 was based on his misrepresentations at his deposition on June 10, 2011.

The purpose of section 654 is to ensure that a defendant's punishment will be commensurate with his culpability. (*People v. Oates* (2004) 32 Cal.4th 1048, 1063.) Nevertheless, as our Supreme Court has explained, "By its terms section 654 applies only to '[a]n act or omission that is punishable in different ways by *different* provisions of law . . . .' [Citation.]" (*People v. Correa* (2012) 54 Cal.4th 331, 341 (*Correa*).) Further, the purpose of section 654 does not "support a bar to multiple punishment for multiple violations of the same provision of law." (*Correa*, *supra*, at p. 341.) Thus, the *Correa* court held that "that section 654 does not bar multiple punishment for violations of the same provision of law." (*Id*. at p. 344.) In so holding, the *Correa* court disapproved contrary dictum in *Neal v. State of California* (1960) 55 Cal.2d 11, 18, footnote 1. (*Correa*, *supra*, at p. 334.) Accordingly, we conclude that the court did not err in refusing to stay the sentence on count 2.

Whether section 654 applies to count 7 is a different issue. Count 7 was based on the misrepresentations that appellant made not only to his doctor wherein he exaggerated how he was feeling, but to the claims adjuster and at his deposition. Appellant argues

that the conduct underlying this conviction was part of his single objective to fraudulently obtain the workers' compensation benefits.

As noted, section 654 prohibits multiple punishment for a single criminal act and for two crimes arising from a single indivisible course of conduct in which the defendant had only one criminal intent or objective. (*People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603.) Thus, it has been said that "[i]f all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. [Citation.] If, however, a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525.)

Appellant's separate actions involved an intent to fraudulently obtain workers' compensation insurance benefits; however, such an intent constitutes too general an objective to constitute one transaction and preclude punishment for temporally separate offenses.

As our Supreme Court has explained in referring to section 654, "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment." (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11 (*Beamon*).) "This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) This rule has been applied in numerous instances when several crimes could broadly be described as part of an overarching criminal plan, but were committed on different days. (See, e.g., *People v. Andra* (2007) 156 Cal.App.4th 638, 640-642, [defendant's commission of identity theft to facilitate a vehicle theft and to obtain money by false pretenses did not implicate section 654, because the identity theft occurred prior to the other crimes];

16

*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1256, [burglary to facilitate commission of crimes nine days later not subject to section 654]; *People v. Williams* (1988) 201 Cal.App.3d 439, 442, [burglary to obtain jewels to facilitate solicitation of murder months later were part of the same scheme but not subject to section 654].)

Without doubt the misrepresentations made at the medical appointments were temporally separated from the April 6 false statements to the claims adjuster that formed the basis of count 1 and the June 10 false statements at appellant's deposition that formed the basis of count 2. As such, appellant had more than ample " 'opportunity to reflect and to renew his . . . intent before committing the next' " offense. (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1289 (*Kurtenbach*).)

Throughout the period in which all the false statements were made, appellant continued to collect workers' compensation in discrete payments, payments that he would not have been able to collect if he had not continued to lie at his medical appointments.

As to counts 4 and 5, appellant argues that the sentence on count 5 should have been stayed because his different misrepresentations regarding his household income were all part of his single objective to obtain welfare aid.

As noted, in count 4 appellant was convicted of fraud to obtain aid and in count 5 of perjury—false affirmation for aid. Count 4 was based on appellant's numerous material omissions to obtain aid from March 1, 2011, to April 11, 2012, including but not limited to his failure to report his workers' compensation benefits. On the other hand, count 5 was based on his failure to report his UIB when he submitted a supporting statement of facts during the recertification process on January 25, 2012.

Plainly, the many material omissions and false statements that appellant made over the course of more than a year were temporally separated from the discrete act of perjury that appellant committed on January 25, 2012. An overarching "intent to defraud the government" does not allow the collection of multiple benefits through multiple crimes while avoiding punishment for all but one. (*People v. Williams* (1980) 106 Cal.App.3d

17

15, 20.)  Again, appellant had more than ample " 'opportunity to reflect and to renew his . . . intent before committing the next' " offense.  (*Kurtenbach*, *supra*, 204 Cal.App.4th at p. 1289.)

Finally, appellant's reliance on *People v. Conners* (2008) 168 Cal.App.4th 443 (*Conners*) for the proposition that the court erred in not staying the sentences on counts 5 and 7 is misplaced.  In *Conners*, the evidence showed that through a fraudulent real estate transaction, the defendant caused a check to be issued to a foundation.  His wife deposited the check into the bank account of the foundation, and over a 10-day period, she wrote—and the defendant cashed—five checks totaling more than $44,000, with each check written for less than $10,000.  (*Id*. at p. 450.)  The defendant was convicted of a single count of money laundering and a single count of receiving stolen property.  (*Id*. at pp. 451-452.)  The appellate court found that in negotiating the checks, the defendant harbored a single intent—to receive the stolen funds—by means of a single, indivisible course of conduct consisting of cashing the checks representing the stolen funds; thus, the court held, the defendant could not be punished separately for money laundering and receiving stolen property.  (*Id*. at p. 458.)  Thus, the court in *Conners* found the single indivisible course of conduct to be the defendant's act of cashing the checks over a brief period of time.  This conduct constituted both the receipt of stolen property *and* the money laundering itself.  The same cannot be said of the conduct here.

In contrast to the defendant's receiving stolen property charge in *Conners*, which was predicated on the identical facts supporting his single money-laundering conviction (the cashing of the checks), appellant's welfare fraud was committed before the specific perjury event took place.  The perjury may have assisted, but was not essential to, the ongoing welfare fraud.  The fact that the perjury assisted in perpetrating the fraud does not make it part of an indivisible course of conduct.  In sum, it may have assisted in perpetrating the fraud, but it was also a means of perpetuating the fraud.

In sum, the trial court did not err in failing to stay the sentences on counts 2, 5, and 7.

<em>Disposition</em>

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

PREMO, J.


*The People v. Bolton*
H041106